UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **TAMIKA VINES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| | ) | NO._____ |
| | ) | |
| **THE MARTIN LUTHER KING, JR.** | ) | |
| **CENTER FOR NONVIOLENT** | ) | |
| **SOCIAL CHANGE, INC.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Tamika Vines ("Plaintiff") submits the following Complaint for damages against Defendant The Martin Luther King, Jr. Center for Nonviolent Social Change, Inc ("Defendant") and respectfully shows the court as follows:

## INTRODUCTION

1. This action is for legal and equitable relief to redress unlawful discrimination on the basis of gender and retaliation arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Lilly Ledbetter Fair Pay Act of 2009 ("Lilly Ledbetter Act"); and the Equal Pay act of 1963, as amended, 29 U.S.C. § 206(d) ("Equal Pay Act"), which provide relief for discrimination in employment on the basis of sex. Plaintiff seeks declaratory and

injunctive relief, back pay, front pay, compensatory damages, punitive damages, liquidated damages, and attorney's fees and costs.

## JURISDICTION AND VENUE

2. Plaintiff's gender discrimination and retaliation claims present federal questions over which this Court has jurisdiction under 28 U.S.C. §§ 1331 *et seq.,* and this Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367.

3. Venue is appropriate in this Court as upon information and belief the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and upon information and belief all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

4. This Court has personal jurisdiction over Defendant as they are located within the geographic boundaries of this Court and/or conduct business within the geographic boundaries of this Court.

## PARTIES

5. Plaintiff is a resident and citizen of the State of Georgia.

6. Plaintiff is female.

7. Plaintiff was an employee of Defendant at all times material to this Complaint, concluding with her unlawful termination.

8. Defendant is a foreign non-profit corporation registered to conduct business in the state of Georgia.

9. Defendant may be served through its registered agent if service of process is not waived:

Registered Agent Name: **Eric Barnum**
Physical Address: **1170 Peachtree Street, Suite 2400, Atlanta, GA, 30309, USA**
County: **Fulton**

## ADMINISTRATIVE PROCEEDINGS

10. On August 5, 2023, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant.

11. On August 25, 2023, after her termination, Plaintiff timely filed an Amended Charge of Discrimination with the EEOC against Defendant.

12. On March 15, 2024, the EEOC issued Plaintiff her notice of right to sue.

13. Plaintiff has exhausted her administrative remedies prerequisite to the filing this suit pursuant to Title VII, the Lilly Ledbetter Act, and the Equal Pay Act.

14. This lawsuit has been filed within 90 days of Plaintiff's receipt of her notice of right to sue.

## STATEMENT OF FACTS

15. Defendant is a 501(c)(3) nonprofit organization established in 1968 as the official living memorial, resource center, and communal institution for people to learn about Dr. Martin Luther King, Jr., and his legacy.

16. During all time relevant to this lawsuit, the Defendant employed more than fifteen (15) employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

17. Defendant is an entity covered by Title VII, and the Equal Pay Act.

18. Plaintiff began working for Defendant on or about May 23, 2022.

19. Plaintiff was hired as the Director of Special Events and Guest Experience with a starting annual salary of $70,000.

20. Plaintiff originally asked for $80,000 as a starting salary but was told by Juanita Stallworth ("Ms. Stallworth"), an HR employee, that the salary was non-negotiable, and Defendant offered Plaintiff a salary of $68,000.

21. Plaintiff stated that she was already making $68,000 in her current position, and Defendant agreed to increase her starting salary to $70,000.

22. Plaintiff was responsible for managing Defendant's guest experiences and leading the Special Events department as well as the Special Events Team ("SET").

23. Plaintiff's first major event was the Beloved Community International Expo, and she partnered with Barbara Harrison ("Ms. Harrison") since this was her first major event and she had not hired a team yet.

24. Plaintiff was complimented on the event by Dr. Bernice King ("Dr. King"), COO Bonita Hampton Smith ("Ms. Hampton Smith"), and several of the Consular Generals that attended.

25. The only recommendations for improvement given to Plaintiff were to acquire more diverse performers and more variety in food truck selections.

26. In August 2022, Defendant began the search for a Special Events Project Manager ("SEPM") to work on Plaintiff's team.

27. Plaintiff advocated for the hiring of Sun Roberson ("Ms. Roberson"); however, the position was offered to Michael Carter, a male. Mr. Carter did not respond to the job offer.

28. As a result, Defendant hired Ms. Roberson at a salary of $57,000.

29. Defendant then determined that Plaintiff's team would benefit from adding another employee.

30. Plaintiff was told by Ms. Hampton Smith that the position would go to a male applicant to "create balance."

31. Plaintiff sent her list of preferred candidates, including females, who were continuously marked as "unqualified."

32. Only male candidates were scheduled for interviews with Plaintiff.

33. In November, the hiring committee ultimately decided to offer the position to Andrus Washington ("Mr. Washington"), a male candidate.

34. Mr. Washington was offered a starting salary of $64,500 even though the previous hire to an equivalent position, Ms. Roberson, was only offered $57,000.

35. Further, Mr. Washington's offer was outside the range provided for the SEPM position, which was $55-$60k.

36. Mr. Washington countered with a $72,000 starting salary.

37. Defendant decided to hire Mr. Washington at the rate of $64,500 along with a negotiated 6-month post-hire raise of $7,500, which would bring him to his desired salary of $72,000.

38. That placed Mr. Washington's compensation offer at a higher level than Plaintiff, who was his supervisor and was substantially more qualified than Mr. Washington.

39. Plaintiff as well as Ms. Roberson were told that starting salary amounts were non-negotiable, but Defendant allowed Mr. Washington to negotiate a higher

starting salary than his peer (Ms. Roberson) as well as negotiating a raise before he even began his position.

40. According to his offer letter, the negotiated raise for Mr. Washington was not contingent on any performance issue, only that he remained employed for six months.

41. Plaintiff was never informed that she would be eligible for a concurrent increase to match Mr. Washington's salary after his raise.

42. Upon information and belief, Plaintiff understood only that after six months, Mr. Washington, her subordinate, would make more money than her.

43. The next weekend of big events for Defendant fell on the King Holiday weekend ("KHO"), where there are numerous events.

44. In its position statement, Defendant claims that there were several performance issues surrounding the KHO events.

45. However, many of the issues attributed to Plaintiff were not, in actuality, her responsibility.

46. For example, Ms. Hampton Smith caused (and acknowledged as such) the delay of the awards show and the artist payment issues.

47. Additionally, Plaintiff's team was not hired until after planning for the KHO was already underway (under the guidance of a hired consultant, Kennedy Mack ("Mr. Mack"), who had previously planned the KHO events).

48. Dr. King evaluated the execution of the KHO under Plaintiff as a B+.

49. Ms. Hampton Smith initially evaluated Plaintiff's execution of the KHO under Plaintiff as a C+, but after Plaintiff made a complaint of gender discrimination, Ms. Hampton Smith re-evaluated the Plaintiff's performance and called it a "failing grade," despite, as noted above, the relatively strong marks given by Dr. King.

50. Further, Ms. Hampton Smith began bullying Plaintiff and her team as early as February 2023 after the KHO events.

51. After a Zoom staff meeting on February 7, 2023, Ms. Hampton Smith called Plaintiff to discuss the fact that Ms. Smtih noticed that Plaintiff "did not clap for her" after Dr. King praised her during the meeting. (It is worth noting that Dr. King also praised Plaintiff and her team's work during the same meeting.)

52. During that call, Ms. Hampton Smith told Plaintiff that they needed to discuss Plaintiff's problem with Ms. Hampton Smith before a meeting with Dr. King the next day.

53. Plaintiff contacted Audia Wells ("Ms. Wells"), the Interim Director of Human Resources, to let her know what Ms. Hampton Smith had said and that she felt bullied by Ms. Hampton Smith and gave Ms. Wells several examples.

54. On February 8, 2023, Ms. Hampton Smith met with Plaintiff, Mr. Washington, and Vonna Jones ("Ms. Jones"), another member of Plaintiff's team, who expressed to Ms. Hampton Smith that they felt targeted and attacked by her since the KHO events.

55. Ms. Hampton Smith, in fact, described herself as a "sniper" during the meeting.

56. The conclusion was made after the meeting, however, that everyone could agree to reset and start over, and Plaintiff updated Ms. Wells with this information.

57. Even after that, Plaintiff was never brought into a performance review meeting, provided with an action plan, or given any information regarding a "pathway to success" to give her an opportunity for "significant improvement."

58. Plaintiff was never reprimanded or given any disciplinary documentation or action after the KHO events.

59. In fact, Plaintiff never received any verbal or written reprimands and/or possible remedial actions, despite Defendant's official disciplinary process referenced in their employee handbook.

60. Additionally, around October 2022, Plaintiff submitted a self-evaluation to Ms. Hampton Smith that Ms. Hampton Smith never acknowledged or responded to.

61. After Mr. Washington received his 6-month post-hire raise (despite the fact that Mr. Washington was also on the team that apparently faced significant performance issues surrounding the KHO events), Plaintiff became aware of the fact that he now made more money than she did, despite, again, him being her subordinate.

62. In fact, Plaintiff was never made aware of Mr. Washington's negotiated pay increase during the first six months of his employment, despite Plaintiff requesting his offer letter at least five times between the date of his hire (November 26, 2023) and the date it was finally provided to Plaintiff in order for her to complete her annual budget (June 14, 2023), a period of almost seven months.

63. Plaintiff was never given any form of formal evaluation, guidance, or negative performance feedback until June 26, 2023.

64. On June 26, 2023, Plaintiff was called into an impromptu meeting with Ms. Hampton Smith after it became clear that Plaintiff knew Mr. Washington was now making a higher salary than Plaintiff.

65. During that meeting, Ms. Hampton Smith stated that Mr. Washington received the raise simply because he asked for it, showing again that there was a gender bias

inherent in the decision to give him a negotiated raise based on nothing but his tenure, while the female members of Plaintiff's team, including Plaintiff herself, were either not offered an increase or told that it would be tied to performance.

66. On or about July 5, 2023, Plaintiff made a formal complaint of gender discrimination.

67. Two days later, on or about July 7, 2023, Plaintiff received a follow-up email from Ms. Hampton Smith accusing her of poor performance and offering her a 90-day period in which her raise would be reconsidered, tying it to performance.

68. However, again, Mr. Washington's raise was never tied to his performance.

69. Ms. Roberson was not offered or given a pay increase, meaning that Mr. Washington now made $15,000 more than Ms. Roberson, his peer.

70. Not only that, Ms. Hampton Smith's email did not identify any specific areas of improvement, instead only making allegations about issues during the KHO event, which was six months prior.

71. There were several events between KHO and the July 7 email from Ms. Hampton Smith that were not mentioned at all.

72. In fact, Defendant maintains that Plaintiff "incessant" performance issues remained but never informed Plaintiff of any other performance issues outside of the events of the KHO.

73. Plaintiff was then terminated on August 22, 2023, under the pretext that she divulged confidential information and created an uncomfortable environment for her colleagues, neither of which allegations are backed up by fact.

## COUNT I

## VIOLATION OF TITLE VII - GENDER DISCRIMINATION

74. Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

75. Defendant discriminated against Plaintiff because of her gender, female, in the terms of wages/compensation and other terms, conditions and privileges of her employment.

76. The selection and pay procedures of Defendant had, and continue to have, a disparate impact on female employees, including Plaintiff.

77. Plaintiff was denied a higher salary because of her sex.

78. The criteria used by Defendant to make selection decisions for employee compensation are discriminatory.

79. Plaintiff was directly affected by the discriminatory practices described including being denied equal pay for equal work and being denied the opportunity to work in an environment free from sexual discrimination.

80. The sex discrimination set forth herein also further adversely affected Plaintiff and other female employees by promoting and reinforcing sexual stereotypes and sexual bias in the workplace.

81. Plaintiff has been subjected to systemic sexual discrimination including, but not limited to, a pattern and practice of intentional discrimination and practices that have an unlawful disparate impact on her employment opportunities. Such sexual discrimination includes a policy and practice of restricting female employers to lower compensation levels. The means of accomplishing such sex discrimination includes, but is not limited to, Defendant's promotion selection and compensation procedures, sexually discriminatory working conditions, and unequal terms and conditions of employment.

82. Defendant's selection and compensation procedures incorporate the following sexually discriminatory practices: 1) reliance upon subjective procedures and criteria which permit and encourage the incorporation of sexual stereotypes and bias against female employees; 2) refusal to establish policies, procedures, or criteria that reduce or eliminate disparate impact and/or intentional sexual bias or stereotypes in Defendant's decision making process for compensation and promotion; 3) refusal to place women on appropriate salary schedules; 4) refusal to compensate women at

the same level as male employees; and, 5) paying women less than male employees for the same or substantially same work.

83. Defendant's compensation and selection procedures have had a disparate impact on Plaintiff. Such procedures are not valid, job related or justified by business necessity. There are objective and structured compensation and selection procedures available to Defendant, which would have a less disparate impact on females and equal or greater validity and job relatedness, but Defendant has refused to consider and/or to use such procedures.

84. Defendant's compensation and selection procedures were implemented with the intent of having a disparate impact on Plaintiff and other female employees.

85. Defendant's compensation and selection procedures have adversely affected Plaintiff and other female employees, including but not limited to, the following ways: assigning females to inferior pay rates, and other unequal terms and conditions of employment in favor of male employees; and encouraging or ratifying sexually discriminatory conditions of work and sexually demeaning stereotypes regarding the capabilities, motivation, and interests of females.

86. Defendant engaged centralized control over the compensation of Plaintiff and other female employees.

87. Defendant has continuously engaged in, condoned and ratified discriminatory practices to constitute a continuing violation of Title VII.

88. Plaintiff has no plain, adequate, or complete remedy of law to redress the wrongs alleged herein, and this suit for back-pay, an injunction, other equitable relief, and a declaratory judgment is her only means of securing adequate equitable relief.

89. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant Employers' unlawful practices as set forth herein unless enjoined by this Court.

90. Because of Defendant's discriminatory employment practices, Plaintiff has experienced harm, including loss of compensation, back and front pay, and other employment benefits.

## COUNT II

## RETALIATION

91. Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

92. Plaintiff engaged in protected activity under Title VII by making complaints of gender discrimination and disparate treatment.

93. After Plaintiff's complaints of gender discrimination and disparate treatment, Plaintiff was retaliated against and subject to adverse employment actions, including termination.

94. The true reason for Plaintiff's termination was to retaliate against her for making complaints of gender discrimination and disparate treatment.

95. In fact, Plaintiff was terminated within a short time of notifying Defendant of her claim, which is evidence of close temporal proximity and retaliatory behavior.

96. As a direct and proximate result of the above-mentioned discriminatory conduct, Plaintiff suffered lost wages and benefits, diminished employment opportunities and emotional distress, for which Defendant Employers are liable.

97. Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's retaliation against Plaintiff was undertaken intentionally and in bad faith.

98. As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

## COUNT III

## VIOLATION OF THE LILLY LEDBETTER FAIR PAY ACT OF 2009 AND THE EQUAL PAY ACT

99. Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

100. Defendant violated Plaintiff's rights under the Equal Pay Act when they deprived her of pay equivalent to those of males performing the same or lesser duties as Plaintiff.

101. Defendant Employers received notice of the above alleged wage inequities directly from Plaintiff.

102. All Defendant's actions were executed intentionally, willfully, knowingly and with malice and recklessness. Moreover, Defendant acted with deliberate indifference to the known or apparent consequences of their actions.

103. Plaintiff has suffered actual injuries and damages as a direct and proximate result of the above-described violations including but not limited to back pay, front pay, and compensatory damages due to the daily emotional distress suffered at her work and the effect of that distress on her health and personal life. Moreover, Plaintiff is entitled to collect liquidated damages against Defendant under the Equal Pay Act for the pay disparities equal to the full amount of back pay owed. And,

because the denial of equal pay was willful, Plaintiff is additionally entitled to recover for three years of back pay.

104. As a direct and proximate result of the Defendant's sex-based discrimination, Plaintiff suffered lost wages and benefits, bonuses, significantly diminished employment opportunities, and emotional distress.

WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

(a) a declaratory judgment that Defendant has engaged in unlawful employment practices in violation of Title VII, The Lilly Ledbetter Act, and the Equal Pay Act;

(b) an injunction prohibiting Defendant from engaging in unlawful employment practices in violation of Title VII, The Lilly Ledbetter Act, and the Equal Pay Act;

(c) full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d) front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e) liquidated damages and compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)     punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendant for its conduct toward Plaintiff and deter it from similar conduct in the future;

(g)     reasonable attorney's fees and costs; and

(h)     nominal damages and any other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of June, 2024.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorneys for Plaintiff
THE MIXON LAW FIRM
3344 Peachtree Street
Suite 800
Atlanta, Georgia 30326
Telephone: (770) 955-0100